CARTER v. WALKER.

(Court of Civil Appeals of Texas. San Antonio. Dec. 23, 1913. On Motion for Rehearing, April 15, 1914.)

1. MUNICIPAL CORPORATIONS (§ 706*)—NEGLIGENT USE OF STREETS—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action for the value of a horse which fell when plaintiff jerked suddenly on the reins, believing that an automobile was about to collide with him, evidence *held* insufficient to show any misconduct on the part of the chauffeur justifying his fear of a collision.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518; Dec. Dig. § 706.*]

2. NEGLIGENCE (§ 72*)—CONTRIBUTORY NEGLIGENCE—ACTS IN EMERGENCIES.

A person through whose negligence another is placed in a position where he must adopt a perilous alternative or in a situation of apparent sudden or imminent danger is responsible for the consequences.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 99, 100; Dec. Dig. § 72.*]

3. MUNICIPAL CORPORATIONS (§ 705*) — CONTRIBUTORY NEGLIGENCE—ACTS IN EMERGENCIES.

An owner of an automobile was not liable for the value of a horse, caused to fall by its driver jerking suddenly on the reins under the belief that a collision was imminent, where there was no misconduct on the part of his chauffeur reasonably calculated to cause a belief that such action was necessary to prevent a collision; it appearing that the owner of the horse was unreasonably frightened without cause.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1515–1517; Dec. Dig. § 705.*]

4. NEGLIGENCE (§ 72*)—CONTRIBUTORY NEGLIGENCE—ACTS IN EMERGENCIES.

When the negligence of another has given rise to a belief of imminent danger, a person is not bound to exercise the prudence of a man of ordinary prudence.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 99, 100; Dec. Dig. § 72.*]

5. TRIAL (§ 127*)—MISCONDUCT OF COUNSEL—STATEMENT AS TO INSURANCE.

In an action for damages claimed to have been caused by the negligence of the driver of an automobile, plaintiff, after testifying that defendant had told him the number of his car and had also made another statement about the car, was asked what such statement was; whereupon defendant's counsel interrupted and told him not to state what somebody else told him, but only what defendant told him. Plaintiff then answered that he said he had insurance on the car. On defendant's objection the court and plaintiff's counsel told the jury not to consider such answer, and plaintiff's counsel further said that they cared nothing about the insurance and only wanted to know what was said as to the number and ownership of the car. *Held*, that the circumstances showed that plaintiff made the statement as to the insurance deliberately with an appreciation of the effect it would have on the jury, since the questions asked him about the conversation showed that he had told his attorney about it, and it would be presumed that his attorney told him that such testimony was not permissible; and hence a judgment for plaintiff would be reversed.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 275; Dec. Dig. § 127.*]

6. TRIAL (§ 133*)—ERROR—CURE BY INSTRUCTIONS TO DISREGARD.

No admonition to the jury could remove the effects of such testimony, as it could not remove the knowledge that the suit was not between citizens, but between a citizen and a corporation.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 316; Dec. Dig. § 133.*]

7. APPEAL AND ERROR (§ 882*)—REVIEW—INVITED ERROR.

Defendant was in no manner responsible for the admission of such testimony, as his counsel could not have known what plaintiff intended to state when he told him not to tell what any one but defendant said.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

8. MUNICIPAL CORPORATIONS (§ 706*)—NEGLIGENT USE OF STREETS—QUESTIONS FOR JURY.

In an action for damages alleged to have been caused by the negligence of the driver of an automobile, evidence *held* to make a question for the jury as to whether defendant's automobile was the one which caused the injury.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518; Dec. Dig. § 706.*]

9. APPEAL AND ERROR (§ 237*)—RESERVATION OF GROUNDS OF REVIEW—MOTION FOR MISTRIAL.

In an action for negligence, where defendant objected and reserved a bill of exceptions to plaintiff's testimony that defendant said he had insurance, he was not required to ask that the cause be withdrawn from the jury and continued.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1302½; Dec. Dig. § 237.*]

Carl, J., dissenting in part.

Appeal from Bexar County Court; John H. Clark, Judge.

Action by T. S. Walker against H. C. Carter. Judgment for plaintiff, and defendant appeals. Reversed and remanded on rehearing.

Terrell, Walthall & Terrell, of San Antonio, for appellant. T. H. Ridgeway, of San Antonio, for appellee.

CARL, J. Appellee, T. S. Walker, sued appellant, H. C. Carter, for the value of a horse belonging to Walker, and alleged that appellant's servant was negligent in driving his car at a high rate of speed on one of the streets in San Antonio; that appellee was driving along in his buggy, and in order to avoid being struck, or having his horse struck, by appellant's car, he jerked his horse around and threw it down, thereby injuring the horse to such an extent she died. Appellant pleaded, in addition to a general demurrer and general denial, contributory negligence on the part of appellee. The trial resulted in a judgment for appellee in the sum of $150, from which this appeal is taken.

The appellant complains that the court erred in refusing to instruct a verdict for the defendant in the county court, to which the case was appealed from the justice court, and assigns such refusal to instruct, by the county judge, as error.

The case seems to have been tried mainly on the issue as to whether the car which caused the wreck belonged to appellant. Walker testified that it was a big gray car. "I was coming down Crockett street in my buggy, and an automobile came down the left-hand side of the street going west, and the negro driving the car turned the car on my buggy and horse, and it either struck me or would have struck me; but I was about half out of the buggy when the horse fell, and I hollered at the negro. There was a cut place on the horse's leg. I saw it was a negro driving the car. I did not see the number of the car. It was a big gray car. I don't know whether or not I have seen the car since. The horse died the next morning after the accident. I took her home. After the horse was knocked down, I helped it up three times before it could stand, and after it got home it laid down and never did get up any more. I paid $150 for the horse. I would have sold her for $175." And substantially: "I am a dealer in horses, and know the reasonable market value in San Antonio at that time. She was worth on the market $150." "It was between Losoya street and the bridge. I was going west downhill, and the automobile was going in the same direction. The boy with the car was about 25 yards behind me when I first saw him. I heard the car coming and saw he was not going to stop, and I hollered at him and began pulling my horse to keep him from striking it. I was driving a one-horse buggy. The wheels of the buggy projected out on either side in the street further than the horse. The negro was coming angling across the street, and it could have hit the horse's head and not have touched the wheels of the buggy. He missed the buggy about the horse's shoulder. I throwed the horse down or he would have hit the horse." "It is rather downhill." "I don't know whose car it was, only what I have been told."

W. C. Fleming corroborates the plaintiff as to the accident, and says he knew the driver; had seen him before that and has seen him since. He saw the number on the car, and says he saw the car with the same driver in it after that, and the car was No. 278, a big gray car. "I first saw the driver when he started to go across Crockett street. I have seen him lots of times before that. When he passed that morning (at Joske's), I recognized him as the man I had seen before. * * * The reason I noticed him was because he was going so fast, about 20 miles an hour."

Sylvester Simonds (the negro driver) said he was working for appellant at the time of the accident, driving a large gray Stoddard-Dayton auto. It was a seven-passenger car, No. 278, and says he had worked for Mr. Carter six or eight years.

Both Walker and Fleming are positive the car which did the damage to the horse was a large gray auto. Both say the driver was a negro. Fleming says he had seen the negro before and since, and that he was driving the car which did the damage, and the car number is Mr. Carter's. We think the evidence was sufficient, and the court did not err in refusing to instruct a verdict for defendant.

It is true that "the broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his life, or his liberty, upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining, as a question of law, whether the testimony establishes more." In the Joske Case, 91 Tex. 574, 44 S. W. 1059, cited, it was held that the facts did not do more than create a strong suspicion; whereas in this case it is shown that Fleming recognized the driver, knew him before and since the accident. He was driving a big gray car, and was working for Mr. Carter, and had been for six or eight years. The number of the car was that of appellant, and on the same day of the accident the driver was driving appellant's car. We think the evidence was sufficient to justify the finding of the jury, and this assignment is overruled.

The court did not err in refusing special charge No. 2 requested by appellant, which is as follows: "In this case you are instructed that if the horse of the plaintiff fell on account of the fact that the plaintiff pulled the rein too suddenly, if he did so pull it, that it was not necessary under the facts and circumstances, or that a reasonably prudent man would not have thought it necessary, for the plaintiff to have so pulled said rein, if he did, and that said act of pulling the rein, if it was 'done, was the proximate cause of the accident alleged, then you will find for the defendant." Authorities cited by appellant do not apply to this case. The charge requested ignores the doctrine of imminent peril. "When one person is placed in a perilous position by the wrongful act of another, the person so situated is not required to exercise the same degree of care that a person of ordinary prudence would have exercised." Railway Co. v. Neff, 87 Tex. 303, 28 S. W. 283; Saunders v. M., K. & T. Ry. Co. of Texas, 35 Tex. Civ. App. 383, 80 S. W. 387, and cases cited. Indeed, when a man is borne down upon by a big seven-passenger automobile at the rate of 20 miles per hour, "prudence" and "ordinary care" are about the least of his assets. In Railway Co. v. Neff, 87 Tex. 303, 28 S. W. 283, it was shown that Neff, in crossing the railway in his wagon, would not have been injured if he had stayed in the wagon; but he jumped out of the back end, fell on the track, and was killed. The Supreme Court held that, when it was shown that the railway company was negligent, the fact that Neff acted rashly or imprudently would not relieve the company. While appellee Walker was on the stand

testifying as to a conversation with appellant, his attorney asked: "Did you ever have a talk with Mr. Carter about this accident? A. Yes, sir. Q. Did you ask him the number of the car? A. Yes, sir. Q. What did he say the number was? A. 276. Q. Did he make any other statement about the car? A. Yes, sir. Q. What did he state? Mr. Terrell (Attorney for Appellant): Don't state what somebody else told you; state what he told you. A. He said he had insurance on the car." This was objected to as immaterial, and the court instructed the jury not to consider same. Appellee's counsel thereupon stated: "We don't care anything about any insurance upon the car. All we want to know is about what Mr. Carter said as to the number and ownership of the car." He then turned to the jury and said: "Gentlemen of the jury, I will ask you not to consider the answer of Mr. Walker about the insurance upon the car."

Appellant complains that, notwithstanding the court instructed the jury not to consider said remark, and appellant's counsel did the same, it was so prejudicial to his case as to require a reversal of the judgment; and we are referred to a rather fertile field of authorities. In the case of City of Austin v. Gress, 156 S. W. 535, the appellee was on the stand, and attorneys for the city asked if he would submit to an examination, to which he replied that, if the court thought it necessary, he would do so. Attorneys for the city stated that appellant would pay for the examination. Counsel for Gress then asked: "Who do you represent, the city of Austin, or an insurance company?" To which the attorney replied: "We represent the city of Austin." Counsel for the appellee then asked: "Been paid by them?" "That is my business," replied the other attorney, "I generally manage to collect my fees." Thereupon counsel for appellee said: "If you will state that it is not for the benefit of an insurance company—" At this point counsel objected, and the court instructed the jury to disregard the remark. The Court of Appeals reversed the case, because it was apparent that it was the deliberate purpose of the appellee's attorney to get the fact before the jury that there was indemnity insurance to protect the city.

In the case of Levinski v. Cooper, 142 S. W. 961, cited by appellant, there appears also an intent on part of counsel to get the impression to the jury that the appellant was protected by insurance. The persistence of shrewd attorneys in getting these prejudicial matters before the jury can only be remedied by withdrawing the case from the jury and selecting another panel, or for the court to reverse the case. The idea that a court can undo the harm done by information of this kind by merely telling them not to consider such statements is pure fiction. After the serpent has thrown its virus into its victim, it would be just about as effective for the physician to tell the patient not to let the poison circulate through his system, as it would for a court to tell a jury they must not consider the very thing it is highly important they should not know. That it is improper to ask questions or to make statements in the presence and hearing of the jury which go to show, or indicate, that the defendant has accident insurance, is well established by the following cases: Levinski v. Cooper, 142 S. W. 960; Trent v. Lechtman (Mo.) 126 S. W. 242; City of Austin v. Gress, 156 S. W. 535.

But in these cases, and indeed in all cases we have been able to find, where cases have been reversed on account of the misconduct of counsel in improperly injecting the matter of insurance into the trial of a case, there was apparently a deliberate intent to get that issue before the jury. This court cannot afford to reverse this case, however, because of the fact that a witness inadvertently mentions insurance. The question asked did not suggest anything of that nature, and there is absolutely nothing, in so far as the record shows, to indicate that counsel expected such an answer as was given. The witness had not answered, and there is nothing to indicate that he would have stated what he did, had it not been that the attorney for the appellant spoke up and said: "Don't state what somebody else told you; state what he told you." Then it was the poison was emitted. Counsel could have stopped him entirely. If he anticipated the insurance matter, he might have had the jury removed and then developed the facts. Furthermore, failing in this, he could have asked that the case be withdrawn from the jury after the answer was made and either continued or another jury impaneled, if he felt it unsafe to proceed. He did not see fit to do so, and we do not think he should now be heard to complain. Mr. Justice Jenkins, speaking of a case of this kind, in City of Austin v. Gress, 156 S. W. 536, says: "Sometimes they (remarks) are made unthoughtedly in the heat of discussion; and in such cases, where the court instructs the jury to disregard them, it will usually be presumed that the jury did so. But where statements, deliberately made, are of such a character that no attorney would have pleaded them, and no well-informed attorney would suppose that he would be permitted to prove them, and the effect of such remarks is highly prejudicial, we can see no way of enforcing proper practice in this regard except to reverse and remand the case, where the party making such remarks has obtained a verdict."

Since the answer in this case does not appear from the record to be the result of a deliberate purpose, and because it was elicited as much by appellant's counsel as by appellee's, we do not feel that we would be justi-

fied in reversing the case; and, finding no material error, the judgment of the county court will be affirmed.

Judgment affirmed.

## On Motion for Rehearing.

FLY, C. J. This is a suit for the value of a mare, instituted by appellee against appellant, in which it was alleged that the mare "was killed or died from injuries sustained on or about the 9th day of February, 1912, by being negligently run into, scared, or caused to fall by an automobile being operated by a servant of said H. C. Carter, on Crockett street, in the city of San Antonio, Bexar county, Tex." The cause originated in the justice's court and was appealed to the county court. In each court judgment was rendered for $150, the amount claimed by appellee.

[1] The facts in this case are quite unsatisfactory. Appellee testified that he was going east in a buggy on Crockett street, and then that he was going west, and that he saw a big gray automobile coming along the street behind him about the distance of 25 yards, and he seems to have become demoralized and got halfway out of the buggy before the automobile passed him on his left, as it should have done; that while he was halfway out of the buggy, and before the automobile reached him, he hallooed to the negro chauffeur, and the mare fell at that time. The hallooing and falling of the mare must have occurred before the automobile reached the spot on which the buggy was standing. He testified: "When I saw it approaching, I hollered at the negro and began to get out of the buggy to keep from getting hurt." He admitted that the mare was not struck by the automobile, and that he threw her down by jerking the reins. He testified: "He missed the buggy about the horse's shoulder. I throwed the horse down or he would have hit the horse. * * * I jerked the right-hand rein and fell, pulling the horse over, and he fell. I throwed her on one side. Some of her feet were on the outside and some under her. Part of her was against the curb. That was the back part. * * * The wheels of the buggy projected out on either side in the street farther than the horse." There was no evidence that the automobile was moving faster than the city ordinances permitted. The evidence of Fleming indicates that the driver intended passing appellee on his right, but evidently he turned his horse very suddenly, and the automobile was thrown over to the left to avoid a collision. He swore that he did not think that the automobile hit the horse. The negro driver swore that he knew nothing of the matters about which appellee and his witness Fleming testified.

[2-4] The law is well established that if a man is placed in a position where he must adopt a perilous alternative, or even where he is placed in a situation of apparent sudden or imminent danger by the negligent acts of another, the latter is responsible for the consequences. Thomp. Neg. §§ 195, 255; Shear. & Red. Neg. § 89; Wharton, Neg. §§ 94, 95. On the other hand, if the act of the plaintiff resulted from rash apprehension of danger which has no existence or from inordinate and unreasonable fear, he is not entitled to recover. There must be some reasonable ground for the belief that some sort of action must be taken in order to protect himself to justify a person in taking such action. While a man is not held to the exercise of such prudence, when the negligence of another had given rise to a belief of imminent danger, as would be exercised by a man of ordinary prudence, still a man cannot recover for damages inflicted by himself through wildly imagining that he was in danger. In order to make a case arising from action on the part of the plaintiff caused by the negligent act of the defendant, it must be shown that there was misconduct upon the part of the defendant reasonably calculated to cause the plaintiff to do the thing that resulted in his injury. There can be no recovery unless there be negligence on the part of the defendant, placing the plaintiff in a situation where he must adopt a perilous alternative or where the negligence of the defendant creates such terror as to cause the plaintiff to act wildly or negligently. The facts in this case do not reasonably show such misconduct upon the part of appellant as would justify appellee in jerking his mare down on the street in a wild attempt to evade an imaginary danger.

The evidence tends to show a case of a man unreasonably frightened at an approaching automobile, 75 feet behind him, losing his mental equilibrium, and jerking his animal down on the street, when there was no ground for fear that there would be a collision. If, however, this be a case that should have been submitted to a jury, still, the facts being so meager, every illegal fact allowed to go before the jury will be scrutinized with exceeding strictness.

[5-7] When appellee was testifying, he was asked if he had ever had a talk with appellant about the accident, and he answered that he had, and that appellant had told him the number of his car. He was then asked if he made any other statement, and he answered: "He said he had insurance on the car." That illegal testimony came from the appellee, who must have known that it was very improper testimony. In consulting with his attorney, he must have told him about the conversation with appellant, or he would not have been interrogated about it, and we must presume that his attorney informed him that such testimony was not permissible. He must have appreciated the effect it would have upon a jury trying a case between two citizens, when it was made known, that a corporation, and not the defendant, would have to discharge the judgment for damages. He must have known that the wavering bal-

ances would go down against the "soulless corporation." No amount of admonition to the jury could remove the effects of the testimony, because it could not remove the knowledge that the suit was not one between citizens, but between a citizen and a corporation.

Appellee cannot escape the effect of the testimony given by him on the ground of his ignorance of the baneful effect it would probably have upon the jury. He must be given credit for common sense and at least a modicum of knowledge of human nature. Judgments have been reversed where attorneys have injected such matters into a trial, and we cannot see that the party has any more right to bring in such matters than would the attorneys. In case of the latter, he might with some degree of reason claim that he had not authorized it; but he has nothing to justify, excuse, or palliate his deliberate conduct in bringing such testimony before the jury. In the statement of facts it is indicated that he was anxious to tell about the insurance company, for after telling about appellant giving him the number of his automobile, he said, "He made another statement about the car." When asked what it was, he replied, "He said he had insurance on the car." The circumstances indicate that he knew that such statement would have a deadly effect on the interests of appellant and therefore testified to it.

In the bill of exceptions it is recited that the attorney, after appellee had testified to what was said to him by appellant about insurance, stated: "We don't care anything about any insurance on the car. All we want to know is about what Mr. Carter said as to the number and ownership of the car." If that was all that was desired to be elicited from appellee the question as to whether any other statement was made by appellant was totally unnecessary, because he had already testified as to what appellant said about the number and ownership of the car.

[8] The evidence as to the identity of the automobile calls for strengthening; there being nothing to sustain it except the testimony of Fleming. He identified the driver, but said: "I don't know that it was the same car. There are lots of gray cars in town, and I don't know the make of either. I don't know whether he was driving the same car the day of the accident as the day I saw him at Joske's." It was, however, sufficient to be considered by a jury.

There was no error in refusing the special charge. If, through the negligence of appellant, appellee was placed in a position where he had to adopt a perilous alternative to protect himself, or if by the negligence of appellant appellee was placed in a situation where in the terror of an emergency for which he was not responsible he acted wildly or negligently, appellant would be liable; but if there was no negligence upon the part of appellant appellee could not recover, no matter how frightened he may have been. Persons driving automobiles on the streets cannot be held liable for injuries resulting from the wild acts of timid persons, superinduced by unreasonable fear. There must be negligence on the part of the defendant to justify action on the part of the plaintiff. There must be a real or apparent peril. Railway v. Rogers, 91 Tex. 52, 40 S. W. 956.

[9] There is no authority for holding that it was the duty of appellant when the unlawful evidence was brought into the case by appellee to ask that the cause be withdrawn from the jury and continued. Such a ruling would preclude a hearing in this court on any error of the trial court, unless there was a formal demand for a withdrawal of the cause from the jury and an application for a continuance or postponement. There are some matters that may arise that would call for such action upon the part of the complaining party, such as discovering the disqualification of a juror during the trial, or when a party is surprised by the testimony of his witness; but such rule has never been applied to the admission of illegal evidence. Appellant did all that was required of him when he objected to the evidence and reserved a bill of exceptions to the admission of the testimony.

Appellant was in no manner responsible for the admission of the illegal testimony. He could not have known what appellee intended to state when he told him not to state what any one but appellant said. The responsibility for the injection of the damaging testimony rests upon appellee. He voluntarily gave the testimony and is charged with a knowledge of its illegal and damaging character.

The motion for rehearing is granted, and the judgment is reversed and the cause remanded.

CARL, J. (dissenting). I think this judgment ought to be affirmed, and that for two reasons: (1) Because the evidence is amply sufficient to justify the judgment of the court below. (2) And because I do not think that the mere mentioning of the fact that appellant had insurance ought to reverse the case when it is not made to appear that it was purposely done, but was a mere incident of the trial, and more especially when the court instructed the jury not to consider such remark and counsel for appellee made a like request.

My views are more fully set out in the original opinion rendered by this court on December 23, 1913; the opinion being written by myself and concurred in at that time by the full court. That opinion will be here referred to for the purpose of expressing my views fully upon the whole case in this dissent.